Smith, J.
On the issues raised in this case as to the claim of S. Kuhn & Sons against the estate of C. A Kebler, and the mode in which it shall be paid from the proceeds of the various securities left as collateral with them, our conclusions are as follows : Kuhn & Sons now hold a note of Kebler for $5,000, dated November 18, 1887, due four months after its date, and they claim that sum to be due, with six per cent, interest thereon from its maturity. The administrator of Kebler alleges, that the note in question is the result of an usurious transaction, and that a much less sum is due thereon for this reason.
The facts are these. The transaction commenced September 23rd, 1885.
On that day Kebler executed to them his note for $11,000, due in four months, and the amount of this note, less the interest for the four months at eight per cent, per annum, was paid by them to Kebler. At its maturity a renewal "note was given for the balance then due, a part of the principal having been paid in the meantime; this note also was to run for four months, and the interest thereon at eight per cent, up to the time of its maturity was paid by Kebler in advance, and other payments were made and renewal notes *601 given, and payment on all, of interest at the rate of eight per cent, made in advance, until the transaction terminated a few days before the death of Kebler, by the giving of the $5,000 note now held by them. Kuhn & Sons were partners engaged in the business of banking in this city, and were not incorporated.
The question for our]decision on this state of facts is, whether the original transaction, or the subsequent renewals of the note, were usurious in character.
It is settled by the decision in Insurance Co. v. Carpenter, 40 Ohio St. 260, that if the lender was a private individual, or a corporation other than for banking or discount business, that such a transaction would be usurious. That by the reservation of interest at eight per cent, per annum, the fact is, that the borrower pays interest on the amount actually received by him, at a rate greater than is allowed by law. And as a result of this, that the lender in an action upon the note could only recover the amount actually advanced, with six percent, interest thereon from the time it was received, after deducting all payments made thereon.
It is also clear from other decisions in this state, that where the original transaction is tainted with usury, and subsequently other notes are given in renewal thereof, which on account of such usury are for more than the amount legally due, and suit is brought upon the last of such renewals, the court on proper pleadings and proofs, will search the whole transaction, and the holder, unless protected by the law of negotiable paper, will be allowed to recover only the amount of the original loan with six per cent, thereon, after crediting all payments thereon at their proper dates.
Does a partnership (not incorporated), engaged in this state in the business of banking, stand in any different position in this respect? It is claimed by the counsel for Kuhn & Sons, that it does; but we are unable to find any warrant for such opinion. The case cited from 15th Ohio St. 68, was In regard to a contract made in the state of New York, by a bank chartered by that state, and it involved only the construction of that charter, and whether under it, the bank was *602 allowed to take interest in advance, and it was held that such was the fact.
The case in 40 Ohio St. 260, before referred to, is also relied on as authority for the position. We understand, however, that it is directly opposed to this idea. The argument of the court is, that as banks and other corporations (particularly if engaged in banking), have in some instances, by special statutes, been authorized to take interest in advance, that this furnishes the strongest implication that the right is denied to all others; -this of course must be held to be the case only where the amount reserved makes it an usurious transaction, for we suppose that any person is authorized ¡¡to take interest in advance, if the case is not one where interest is thus charged or paid at a rate higher than eight per cent"per annum.
Counsel also cite us to sec. 10 of the act of March 21, 1851, to authorize free banking (3 Williams, Rev.*'Stat. 367), to show that the right is there conferred on banks to discount bills of exchange, which it is claimed is a virtual authorization to take interest in advance, at the highest rate allowed by law.
Leaving out of view the question whether this is so', after the repeal of section 24 of the same act, which expressly authorizes banks organized under it to take interest not exceeding six per cent, in advance, this certainly can not be held to authorize individuals, or partnerships engaged in banking to do this. The law only applies to corporations organized under that statute. Our conclusion then is, that partnerships engaged in the banking business, have precisely the same rights in this respect as individuals not so engaged, and must conform to our interest laws as do individuals.
We further find that whatever balance may be due to Kuhn & Sons on their claim, is to be paid and satisfied out of the Cor-bin mortgage or the proceeds realized from it. And that this is so, even if the bill of sale made by Kebler to Mrs. Leonard and others on the night before his death, is or is not valid as to the other claims Attempted to be transferred thereby. And for the reason, that so far as this mortgage is concerned, no one else has any claim to it, as Kebler had no interest in it which he could assign. The facts as to this are these. Kebler, *603 while the owner of the Oak street property, executed a note-for $10,000 to Mr. Corbin, a clerk in his office, and a mortgage-securing it, solely for his own accommodation, and to enable him to make the loan from Kuhn & Sons, for which loan it was deposited as collateral security. It is still held by Kuhn & Sons as collateral for the balance due on their claim, and for that alone. When this balance is paid, the note and mortgage will have fully performed their office, and will be satisfied. Any residue of the note could not have been an asset, or chose of action which Kebler could assign or transfer, particularly for a pre-existing debt.
Another question which arises m the case, and which involves several interesting and important questions, both of law and of fact, and on which we have heard a good deal of testimony, is, as to what effect, if any, is to' be given to the instrument executed by Kebler on the night of the 22nd of November, 1887, and whether it was operative to transfer to Mrs. Leonard and the other persons named therein, the choses in action therein described. It is obiected that it did not, for two reasons: First, that it was not delivered; and Second, that if it was, the legal effect of it was thereby to make it an assignment under sec. 6348 Rev. Stats, for the benefit of all the creditors of Kebler. We consider the last point first.
The substance of this instrument is this: It declares that in consideration of $9,000, owed by him to Mrs. Leonard, he sells, assigns and transfers to her the chattel property therein described. Also certain promissory notes which he mentions, including among them the Brown note made to his order and stated to be pledged to Kuhn, the Portsmouth Railroad bonds, after the debts for which they were pledged were paid, and any other collateral owned by him, and not needed by S. Kuhn & Sons for the debt for which it was pledged to them, and it proceeds as follows:
“ After the above debt of $9,000 has been satisfied, I sell, assign and transfer to Adolf Harfcdegen any or everj*' thing above transferred, or the proceeds of the same, in consideration of $3,800 I owe him, and until said proceeds have paid said $3,800.
After said H. D. Leonard and Adolf Hartdegen have been paid in full, I sell, assign and transfer to Mary S. Russell, any *604 •and all other articles or proceeds left until my indebtedness to her is paid.”
Without going into an extended discussion of the question, we say that, in our opinion, this was not such a transfer as operated as an assignment for the benefit of the creditors of Kebler. We understand the'law to be, that a failing debtor imay by one instrument make a conve3>'ance of property, either .•absolutely or by way of mortgage, to two or more persons in ¡payment of, or as security for their several claims. Or he may •do the same thing by successive mortgages to them severally, whereby one or more of those so secured, have priority over others secured by subsequent instruments. There can be no • doubt, then, that if this paper had contained a transfer of this .property to the three persons named, without attempting to ••give priority to one over another, but allowing them all to ¡•stand on the same footing, that it would not have been open to the objection now urged against it. But we see no reason wh}’ • the mere fixing of priority among these persons, should make • it operate differently. As before stated, it is perfectly legiti••mate to do this by separate successive instruments, and the ilaw looks to the substance rather than the form of a trans..action.
It has been held “ that a mortgagee is in some respects a “trustee, but this arises merely as an incident to his relation .as mortgagee, and is not the kind of trustee designated in the ¡statute.” See 1 Ohio St. 237; 5 Ohio St. 219, and 10 Ohio St, 176; and the same may be truly said, we think, as to the relation of Mrs. Leonard to Hartdegen. and Mrs. Russell, and of ..Hartdegen to the-latter.
As we understand the section referred to, it relates to cases in which a conveyance is made to one or more persons, to se-cure not only their claims, but the claims of those not named -therein as grantees; and,’of course, when this is done, the relation of trustee and beneficiary at once is created.
The next inquiry is, was this paper delivered to Mrs. Leonard ?
To determine this question, a brief statement of the facts, .as we find them to be, is necessary.
It is evident from all that occurred, that on the night of *605 November 22nd, 1887, Mr. Kebler was intending to take his-life the next morning. He spent the evening with Mrs.. Leonard, his mother-in-law, who was a member of his family,, and went to his room about 11 o’clock.
There he wrote the instrument in question — a letter of farewell to Mrs. Leonard, and letters to his own mother and brothers, the contents of which have not been disclosed to us. A memorandum on the back of the letter to Mrs. Leonard' (“ farewell, 5 A. M.”) would indicate that he did not finish his-writing till that hour. He was called by Mrs. Leonard a few minutes before 8 A. M., but he asked her to call him again at-J before 9 o’clock. At half-past eight Mr. Roelker, his partner,, called, and his mother-in-law again went up stairs and asked if he would see him. Kebler said that he would, and Mr, Roelker went into his room for a few minutes. After he left, Abbott Kebler, a brother, came and went to his door, but did not go into his room, as his brother Charles called to him that he would be down stairs in five minutes. He did not come for twenty minutes, and hearing no noise in his room Mrs. Leonard again went to his door, heard him breathing heavily,, and ran in and found him lying on his bed in his night-clothing. She exclaimed “Oh, Charles,” and he gave a look or sign of response or recognition, but was unable to speak,, and was almost unconscious. By his side, on the bed, lay the paper in question, enclosed in the envelope. The letter to-Mrs. Leonard was in another envelope, addressed to her, and: the two were held together by a rubber band. By his side, on the bed, lay the other letters he had written, a satchel of letters, and some pictures. Mrs. Leonard at once took possession-of the letter addressed to her, and the paper in question, and1 has had possession of them ever since.
Was there then a delivery of this paper to Mrs. Leonard, or was that done which in law was equivalent to it ? This we understand to be essential. It is a general rule in all contracts of bargain and sale, deeds, notes and other instruments, and in gifts of all kinds, that to transfer the title from one person to another, there must be either a delivery of the property itself, the subject of the contract, or of the instrument by which the title purports to be transferred, and this *606 delivery in either case may be actual, constructive or symbolical. The only exception, or apparent exception to this doctrine, of which we are advised, is the case of a voluntary settlement by a parent upon a child, or the release of a debt •owing by the child, as to which the holding of some courts is (though it is not at all uniform or well settled), that the retaining by the parent of the deed of settlement, is not to prevent its operation as such, unless it clearly appears that it was not in fact to be delivered or take effect. But these cases seem to proceed, to some extent at least, on the theory, that the settlement was by deed duly signed and attested by witnesses, called for that purpose, and that this in substance was a delivery. See as to this question, 2d Sandford’s Chan. Rep. 400, and cases cited.
But the case at bar is not of this character. This instrument was not executed in pursuance of any contract that it ■should be done, or be [left for the grantee at any particular place. The presumption is, that it was the act of a person desiring to make some amends to those whose money he had received and wasted. None of the grantees had any knowledge of it until it was found by his side, while in the agony of death. It seems to us.then, that so far as the question of delivery is concerned, it would be governed by the law applicable to gifts — that it is not essentially different from what it would have been, if Kebler being entirely solvent, had undertaken in this manner to give to these persons, the property mentioned in the instrument. If this be so, it is exceedingly difficult for us, if we are to be bound by the decisions of our own Supreme Court, as we must be, to hold that there had been a valid delivery of this instrument to the persons named therein, or to either of them. In 16 Ohio St. 586, .a case is[[reported which in some of its features strongly resembles this one, and it was there held, First, that “ to constitute a valid’gift inter vivos, or causa mortis, a delivery, either •actual, constructive or symbolical, is essential; and Second, directions by an owner in respect to a disposition of his property, to take effect after his death, and different from such as the law would prescribe in case of intestacy, are of no validity unless made through the medium of a last will and testament.”
*607 In that case an uncle agreed with a nephew, that if he would work for him, he would finally make or leave him well off, which the nephew on the faith of the promise, did. On January 13th, 1862, the uncle being then the owner and payee of a note of one Porter, dated March 26th, 1856, in consideration of the premises, enclosed said note in an envelope with a statement signed by him, that the contents were to be given to the nephew in payment of his wages, and authorized him to endorse and collect it. There was also endorsed on the envelope a direction that it be given to the nephew by the person legally authorized to examine its contents. After-wards, the uncle received one year’s interest on the note. On his death, the envelope containing the said indorsement, assignment and note, were found in a box where they had been deposited by the uncle. But the court held that the attempted transfer was invalid, First, for the reason that there was no delivery of the note itself, or of the transfer; and Second, on the ground that he evidently contemplated a delivery after his death.
It would seem that the facts relied on to show a delivery of the note and transfer, were stronger in that case, than in the one before us.
The case of Flanders v. Blandy, 45 Ohio St. 108, is also a strong one against the theory of a delivery in this case. The facts there relied on to show a delivery of the bonds claimed by a daughter as a gift from her father, were also much more explicit than in this case. But it was held that there was no delivery of the bonds, and the court in the opinion state the doctrine on this point clearly and forcibly. They say: “ To render the gift complete, there must be an actual delivery of the chattel so far as the subject is capable of such a delivery, and without such a delivery the title does not pass. If the subject be not capable of actual delivery, there must be some act equivalent to it. ‘ The necessity of delivery,’ says Chancellor Kent, ‘ has been maintained in every period of the English law.’ The donor must part not only with the possession, but with the dominion and control of the property.”
We think the evidence in this case shows nothing to indicate that Kebler lost the dominion or control over this paper. *608 If he had chosen, the moment before he took the fatal dose of poison, to destroy the instrument, who would have had a legal right to complain, or to assert that by what had taken place, viz.: the writing and signing of it, and putting it with a letter to Mr. Leonard, that the title to it and to that which it mentioned, had passed to the grantees or assignees therein named? What court could rightfully have ordered Kebler to turn it over to them if he had recovered ? It is manifest that he had not parted with the instrument or his right to it, when Mrs. Leonard took possession of it. If this be|so, no delivery was made of it.
We are also of the opinion that it was the intention of Mr. Kebler that the paper should not come to the possession of Mrs. Leonard until after his death, and that on this ground there are serious objections to its validity. He evidently contemplated suicide that morning.
He had ample opportunity if he had wished to do so, to give the paper to Mrs. Leonard before taking the poison. She was at his door at two separate times before he did so, and --spoke to him, and he anwered her. He could on either occasion have handed it to her, and put the matter beyond dispute, but for some reason he did not do it. The strong presumption is, that he intended it should come into her possession when he was found dead, for he had it- with the other papers on the bed with him, when he took the poison, which so speedily and surely destroys life.
Many authorities have been cited to show that when the grantee is found in possession of the deed, or transfer of any kind, that a delivery will be presumed. But evidently this rule only applies where there is no proof showing the real manner in which it came into his possession. If the testimony shows just how it was, there is no room for presumption, and the court must decide according to the evidence submitted.
For many reasons urged in argument to us, we would have been glad to have been able to arrive at a different conclusion on this point, but with our views of the law and the testimony we have not been able to do so.
Wilby & Wald, for administrator of Kebler. Kramer & Kramer, for S. Kuhn & Sons. I. M. Jordan, for Mrs. Leonard. Mr.,Cahill, for Hartdegen. Avery & Holmes, for Mrs Russel.
Thomas McDougall, Kittredge & Wilby, Champion & Williams, Healy & Brannan, McClintick <& Strong and Rufus B. Smith, for various creditors of Kebler, and claimants of different securities.
(Mem. — Many other controversies between the parties of this case were decided by the court, but as they involved questions of fact principally, a report of them is not given.)